USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___6/29/2018___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
                           :

RAYMOND ROSAS,                :
                           :

               Plaintiff,   :              12-CV-6557 (VSB)
                           :

        - against -       :        **OPINION & ORDER**
                           :

BALTER SALES CO. INC., et al.,   :
                           :

           Defendants.  :
                           :

-------------------------------------------------------X

<u>Appearances</u>:

Derek Todd Smith
Derek Smith Law Group, PLLC
New York, NY

Bryan Samuel Arce
Gregory William Kirschenbaum
The Arce Law Group PC
New York, NY
*Counsel for Plaintiff*

Andrew L. Richards
Matthew Cohen
Kaufman Dolowich & Voluck LLP
Woodbury, NY
*Counsel for Defendants*

<u>VERNON S. BRODERICK, United States District Judge</u>:

      Plaintiff Raymond Rosas brings this action against Defendants Balter Sales Co. Inc.

("Balter Sales"), Arnold Balter, Marc Balter, and Barry Rosenberg (collectively, "Defendants").

Following the dismissal of certain claims on summary judgment, Plaintiff's remaining claims

include:  (1) discrimination on the basis of race in violation of 42 U.S.C. § 1981 ("§ 1981"), the

New York State Human Rights Law (the "NYSHRL"), N.Y. Exec. Law § 296, and the New

York City Human Rights Law (the "NYCHRL"), N.Y.C. Admin. Code § 8-107(1a); (2) discriminatory retaliation in violation of the NYSHRL and the NYCHRL; and (3) common law battery.

Following an eight day trial, the jury returned a verdict in Plaintiff's favor, determining that: (1) Balter Sales and Marc Balter subjected Plaintiff to race-based discrimination in violation of § 1981 and the NYSHRL; (2) Balter Sales, Marc Balter, and Arnold Balter subjected Plaintiff to race-based discrimination in violation of the NYCHRL; (3) Balter Sales and Marc Balter subjected Plaintiff to retaliation in violation of the NYSHRL; (4) Balter Sales, Marc Balter, and Arnold Balter subjected Plaintiff to retaliation in violation of the NYCHRL; and (5) Barry Rosenberg committed common-law battery against Plaintiff. The jury awarded Plaintiff compensatory damages in the amount of $250,000 against each of Balter Sales, Marc Balter, and Arnold Balter, and $50,000 against Barry Rosenberg, for a total compensatory damage award of $800,000. The jury also awarded Plaintiff $1.4 million in punitive damages against Balter Sales, Marc Balter, and Arnold Balter.

Before me is Defendants' motion under Federal Rule of Civil Procedure 50 for judgment as a matter of law and under Federal Rule of Civil Procedure 59 for a new trial or a remittitur concerning the damage awards, (Doc. 150), and Plaintiff's motion for attorneys' fees and costs, (Doc. 141). For the reasons stated below, Defendants' motion for judgment as a matter of law is denied and Defendants' motion for a new trial with respect to the compensatory and punitive damages awards is granted unless Plaintiff accepts a remittitur as to those awards. Plaintiff's motion for fees and costs is denied without prejudice as moot.

# I.    Background

Plaintiff was employed by Balter Sales from October 2010 through January 2012 as a truck driver.  (Tr. 80:18-24; 82:13-14.)[1]  Plaintiff's primary duties included loading trucks and delivering Balter Sales' glassware to customers.  (Tr. 81:1-8.)

According to the evidence presented at trial, during Plaintiff's tenure as a truck driver he was subjected to repeated harassment by Marc Balter, a Vice President and co-owner of Balter Sales.  In particular, Marc Balter used a Latin accent in a mocking and discriminatory manner when speaking to Plaintiff, who is Hispanic, multiple times per week throughout the fifteen months that Plaintiff was employed by Balter Sales.  (Tr. 82:17-85:7.)  Marc Balter used the same mock Latin accent around the office when speaking to other Hispanic employees.  (Tr. 84:23-85:7; 470:1-15.)  Plaintiff testified that Marc Balter did not speak to white employees the way he spoke to Plaintiff or other Hispanic or black employees.  (Tr. 86:16-17.)  Marc Balter also told Plaintiff that he had a "Latin attitude" when Plaintiff complained to him.  (Tr. 92:4-10; 582:1-11.)  Marc Balter also used derogatory terms and phrases when speaking to minority workers, including "spic" and "stupid Colombian."  (Tr. 459:1-10; 464:8-15; 628:7-13; 630:12-13; 631:3-17.)

In addition, Plaintiff was subjected to unwanted physical contact by Barry Rosenberg, one of Plaintiff's supervisors.  Plaintiff interacted with Rosenberg at work numerous times on a weekly basis to check inventory, obtain and select merchandise, and load trucks.  (Tr. 87:15-22.)  Plaintiff testified that Rosenberg made several sexual advances toward him, including attempting to lick Plaintiff's ears, touching his buttocks, and massaging his shoulders.  (Tr. 88:2-4.)  Plaintiff asked Rosenberg what he was doing and asked him to stop, but Rosenberg did not

---

[1] "Tr." refers to the consolidated trial transcript.  (Docs. 122, 124, 126, 128, 130, 132, 134, 136.)

comply.  (Tr. 88:17-89:5.)

Plaintiff complained to his supervisors, including Marc Balter, on multiple occasions regarding both Marc Balter's discriminatory conduct and Rosenberg's harassment. (Tr. 89:17-22; 90:23-92:3.)  Plaintiff additionally testified that he "complained about the truck not having any locks," and about truck safety and security to Marc Balter, noting that anyone could lift the tailgate of the trucks and gain access to the boxes of glassware.  (Tr. 98:20-22; 99:1-4; 100:1-10.)

On January 2, 2012, Plaintiff was fired after being accused of stealing boxes of champagne flutes.  (Tr. 95:9-25.)  After his employment was terminated, Plaintiff told Marc Balter that he was going to hire a lawyer.  (Tr. 96:24-97:4.)  Marc Balter responded by saying that he was going to have Plaintiff arrested.  (Tr. 97:5-6.)  On January 17, 2012, Plaintiff was arrested by New York City police officers at his home in Tuckahoe, New York.  (Tr. 103:10-22.)  He was transported to a holding cell in New York City and criminally charged with stealing the champagne flutes.  (Tr. 104:15-17; 108:12-14.)  The missing glasses were later found, but when Marc Balter was told the glasses were found he "[b]lew it off."  (Tr. 396:8-18; 397:12-14.)

Plaintiff testified that being harassed, assaulted, fired, unemployed, and criminally charged caused him to experience constant high anxiety and a depressed mood.  (Tr. 118:16-17.)  As a result, Plaintiff started drinking again.  (Tr. 119:5.)  Plaintiff also had trouble sleeping through the night.  (Tr. 122:10-13.)  Plaintiff called Stephen Reich, PhD, a psychologist, as a witness.  Dr. Reich testified that in his opinion the racial harassment, firing, and false allegations of stealing from Balter Sales caused Plaintiff to develop chronic anxiety and depressive syndrome, among other problems.  (Tr. 339:24-340:7.)

## II.   Procedural History

Trial commenced on November 16, 2015 and lasted eight days.  Plaintiff called five witnesses:  (1) the Plaintiff; (2) Dr. Stephen Reich; (3) Cam Pardo, a current employee of Balter Sales; (4) Marc Mungo, a former employee of Balter Sales; and (5) Willie Rivera, a former employee of Balter Sales.  Defendants called four witnesses:  (1) Defendant Rosenberg; (2) Defendant Marc Balter; (3) Lori Balter, the Chief Executive Officer of Balter Sales; and (4) Arthur Dibiasi, a current Balter Sales employee.  The jury returned a verdict on November 24, 2015 finding that Plaintiff had proven that he was subjected to race-based discrimination, retaliation, and battery, and awarded a total of $800,000 in compensatory damages.  (*See* Doc. 119.)  On November 25, 2015 the jury reached a verdict on punitive damages, awarding $1,400,000.  (Doc. 120.)

Plaintiff filed a motion for attorneys' fees on December 22, 2015, along with a memorandum of law and declarations in support.  (Docs. 141–45.)  Defendants filed an opposition to the motion for attorneys' fees on January 29, 2016, (Doc. 154), and Plaintiff filed a reply and declaration in support on February 5, 2016, (Docs. 157, 158).

On January 5, 2016, Defendants filed a notice of appeal.  (Doc. 148.)  That same day, Defendants also filed their post-trial motion and memorandum in support.  (Docs. 149, 150.)  Consistent with my instructions, (Doc. 152), Defendants filed a supplemental memorandum in support of their post-trial motion on January 29, 2016, (Doc. 153).  On February 5, 2016, Plaintiff filed his opposition to the post-trial motion, (Doc. 156), and on February 26, 2016, Defendants filed their reply, (Doc. 167).  On February 4, 2016, the Second Circuit issued a notice of stay of the appeal.  (Doc. 155.)  On March 11, 2016, I stayed entry of the judgment in this matter pending resolution of the post-trial motion.  (Doc. 168.)

### III. <u>Discussion</u>

#### A. *Defendants' Motion for Judgment as a Matter of Law*

##### 1. **Applicable Law**

Federal Rule of Civil Procedure 50 "imposes a heavy burden on a movant, who will be awarded judgment as a matter of law only when 'a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Cash v. Cty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (quoting Fed. R. Civ. P. 50(a)(1)). The "burden is particularly heavy where . . . the jury has deliberated in the case and actually returned its verdict in favor of the non-movant." *Id.* (internal quotation marks omitted). In such circumstances, a court may set aside the verdict only if, viewing the evidence in the light most favorable to the non-movant, "there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." *Id.* (internal quotation marks omitted); *see also, e.g.*, *Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007) (stating that a Rule 50 motion may be granted only if the court concludes that "a reasonable juror would have been compelled to accept the view of the moving party") (internal quotation marks omitted). This standard under Rule 50 is "well established." *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998).

## 2. Application

Defendants move for judgment as a matter of law on all claims. I address each claim in turn below.

### a. Discriminatory Termination

It is well-established that discrimination claims brought under § 1981 are analyzed under the same standard as claims arising under Title VII of the Civil Rights Act of 1964 ("Title VII"), using the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Hyunmi Son v. Reina Bijoux, Inc*., 823 F. Supp. 2d 238, 242 (S.D.N.Y. 2011). A plaintiff first bears the burden of establishing a prima facie case of discrimination by showing: (1) membership in a protected class; (2) that he performed his duties satisfactorily; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination on the basis of his race. *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012). A plaintiff's burden of proof in establishing a prima facie case is de minimis. *Johnson v. IAC/Interactive Corp*., 2 F. Supp. 3d 504, 512 (S.D.N.Y. 2014). If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to provide evidence that the adverse action was based upon a "legitimate, nondiscriminatory reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07 (1993) (internal quotation marks omitted); *accord Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014). If the defendant articulates a nondiscriminatory explanation for the adverse employment action, "the burden shifts back to the plaintiff to demonstrate by competent evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Patterson v. Cty. of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004) (internal quotation marks omitted); *accord Kirkland*, 760 F.3d at 225. A plaintiff may do so

"either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Hicks*, 509 U.S. at 517.

"[C]laims brought under [the NYSHRL] are analytically identical to claims brought under Title VII."[2] *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011) (internal quotation marks omitted). The standard to which a plaintiff is held under the NYCHRL is lower. *See Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009). "To establish a . . . discrimination claim under the NYCHRL, the plaintiff need only demonstrate 'by a preponderance of the evidence that she has been treated less well than other employees because of her [race]." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (quoting *Williams v. N.Y.C. Housing Auth.*, 872 N.Y.S.2d 27, 39 (1st Dep't 2009)).

It is undisputed that Plaintiff satisfied the first two elements of a prima facie claim. (*See generally* Defs.' Mem. 15.)[3] Regarding the third element, although Defendants claim that Plaintiff failed to demonstrate that he suffered any adverse action, (Defs.' Mem. 15; Defs.' Reply 2)[4], termination of employment is the quintessential adverse employment action, *see Taylor v. Seamen's Soc. for Children*, No. 12 Civ. 3713(PAE), 2013 WL 6633166, at *12 (S.D.N.Y. Dec. 17, 2013).

---

[2] The same "core substantive standards" applicable to Title VII claims are applicable to the § 1981 claims at issue in this motion. *See Patterson*, 375 F.3d at 225.

[3] "Defs.' Mem." refers to Defendants' Memorandum of Law in Support of Motion for a Judgment as a Matter of Law, or, in the Alternative, a New Trial or Remittitur of Damages. (Doc. 149.) The pages of Defendants' Memorandum do not have consecutive or continuous numbers. Accordingly, all references to that memorandum will be to the numerical page numbers provided by the court's ECF system.

[4] "Defs.' Reply" refers to the Reply Memorandum of Law in Support of Defendants' Motion for Judgment as a Matter of Law, or, in the Alternative, a New Trial or Remittitur of Damages. (Doc. 167.)

With respect to the fourth element, Plaintiff offered evidence during the trial that the termination of his employment occurred under circumstances giving rise to an inference of discrimination. Because "smoking gun" evidence of racial discrimination is rarely available, plaintiffs frequently must raise an inference of discrimination through circumstantial evidence. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994). Such circumstances might include "the employer's criticism of the plaintiff's performance in ethnically degrading terms, or its invidious comments about others in the employee's protected group, or the more favorable treatment of employees not in the protected group, or the sequence of events leading to the plaintiff's discharge." *Id.* (internal citations omitted).

Here, Marc Balter mimicked a Latin accent in a stereotypical and offensive manner throughout the duration of Plaintiff's employment, (Tr. 82:15-83:10), and less than a month before firing Plaintiff attributed certain aspects of Plaintiff's job performance to his "Latin attitude," (Tr. 92:4-10; 226:11-16). Given the allegedly ongoing and pervasive nature of these taunts, which reasonably could be viewed as discriminatory, and the fact that they were made by Marc Balter—the person who fired Plaintiff—these comments could have been interpreted by the jury as more than just "stray remarks." *Cf. Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010). Furthermore, Plaintiff testified that he complained to Marc Balter about his treatment in both August and December 2011, including approximately one week prior to being fired. (Tr. 89:8-91:17; 92:17-94:2.) The close proximity of these events, without any suggestion that Defendants took steps to remedy the situation, could allow a reasonable juror to infer discrimination in Plaintiff's firing. *Cf. E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 855 (S.D.N.Y. 2013) (finding that proximity of events can raise inference of discrimination, though passage of two months and employer's intervening attempt at accommodation defeated

inference).

In response, Defendants offered evidence that the adverse employment action—the termination of Plaintiff's employment—was based upon a legitimate, nondiscriminatory reason: that they suspected Plaintiff of stealing company merchandise.

To carry his final burden of demonstrating pretext, Plaintiff offered evidence that: (1) the glassware that he had been accused of stealing was found immediately after his termination, (Tr. 109:17-21; 396:8-18); (2) Marc Balter did not seem to care that the glassware was found, (Tr. 397:12-14); (3) Defendants acknowledged that the surveillance video footage on which they largely based their belief that Plaintiff had stolen from them did not unequivocally support that belief, (Tr. 767:16-768:22; 934:20-935:11); and (4) Balter Sales was not well organized and was in a chaotic state during the time Plaintiff allegedly stole the glasses, (Tr. 395:1-15; 928:4-14). Such "weaknesses, implausibilities, inconsistencies, [and] contradictions," *see Kwan v. Andalex Grp.*, 737 F.3d 834, 846 (2d Cir. 2013), coupled with the temporal connection between Plaintiff's complaints and his firing, could allow a reasonable jury to conclude that the theft allegations were merely pretext for the discriminatory termination of Plaintiff's employment.

Plaintiff also presented evidence sufficient to satisfy the lesser NYCHRL standard. Plaintiff testified that Marc Balter treated white employees more favorably than minority employees. For instance, Marc Balter did not speak to white employees in a mocking accent, (Tr. 86:2-17), and used derogatory and offensive terms, including "spic" and "nigger," when speaking about minority employees, (Tr. 459:1-10; 526:6-17). Plaintiff's co-workers similarly testified that they perceived Marc Balter as treating white employees more favorably than black and Hispanic employees, including Plaintiff. (*See* Tr. 400:17-401:3; 639:7-13.)[5]

---

[5] Under the NYSHRL and the NYCHRL, an employer can be liable for discriminatory conduct where an employee who engaged in unlawful conduct exercised managerial or supervisory responsibility. *See Townsend v. Benjamin*

Accordingly, Defendants' motion for judgment on the pleadings with regard to Plaintiff's discriminatory termination claim is denied.

b. <u>Hostile Work Environment</u>

To state a hostile work environment claim under § 1981, a plaintiff must demonstrate that the complained of conduct: "(1) is objectively severe or pervasive; (2) creates an environment that the plaintiff herself subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [protected status]." *Goins v. Bridgeport Hosp.*, 555 F. App'x 70, 71–72 (2d Cir. 2014) (summary order). In determining whether a work environment is objectively hostile or abusive, courts must review the totality of the circumstances, evaluating such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547 (2d Cir. 2010) (internal quotation marks and emphasis omitted). "The Second Circuit has held that 'isolated instances of harassment ordinarily do not rise' to the level of 'objective hostility'; rather, a plaintiff must demonstrate either a single incident that was 'extraordinarily severe' or a series of incidents that were 'sufficiently continuous and concerted.'" *Kouakou v. Fideliscare N.Y.*, 920 F. Supp. 2d 391, 402 (S.D.N.Y. 2012) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)).

A NYSHRL hostile work environment claim is analyzed under the same general standard

*Enters., Inc.*, 679 F.3d 41, 57 (2d Cir. 2012); *Zakrzewska v. New Sch.*, 928 N.E.2d 838, 842 (N.Y. 2010). Indeed, the NYSHRL and the NYCHRL impose strict liability on an employer for the unlawful discriminatory acts committed by a manager or supervisor. *Townsend*, 679 F.3d at 57; *Zakrzewska*, 928 N.E.2d at 842–43. Moreover, the jury instructions agreed to by the parties state that under the NYCHRL, an individual may be considered an employer if he holds an ownership interest in the company or has the power to make personnel decisions. (Tr. 1049:20-1050:5.) It is undisputed that Marc Balter held a managerial and/or supervisory role, (Tr. 81:17-18; 398:23-399:10), and that Arnold Balter was the owner of Balter Sales, (Tr. 287:2-3; 398:16-22; 709:20-25). Therefore, Balter Sales was properly found liable for Marc Balter's unlawful conduct under the NYSHRL and the NYCHRL, as was Arnold Balter under the NYCHRL.

as a § 1981 claim, *see Rojas*, 660 F.3d at 107 n.10, but conduct need not even rise to the level of "severe or pervasive" to be actionable under the NYCHRL, *Mihalik*, 715 F.3d at 113.

Plaintiff presented evidence at trial that Marc Balter repeatedly harassed Plaintiff based on his Hispanic heritage such that a reasonable jury could find that Plaintiff was subjected to a hostile work environment.  Plaintiff testified that Marc Balter often made fun of his accent and/or mimicked a Spanish accent during their interactions.  (Tr. 82:7-13; 84:10-22.)  Plaintiff testified that this happened three or four times a week for the duration of his employment.  (Tr. 83:4-10.) William Rivera, one of Plaintiff's co-workers, corroborated this testimony, stating that Marc Balter spoke to Plaintiff in a mock Spanish accent "a lot of times."  (Tr. 470:1-7.)  Marc Balter spoke to other Hispanic employees using a similarly demeaning accent.  (Tr. 85:3-14).  Marc Balter's conduct made Plaintiff feel humiliated and insulted.  (Tr. 82:17-23; 84:20-22.)  Plaintiff and other employees also testified that Marc Balter used other offensive and derogatory phrases, including telling Plaintiff that he had a "Latin attitude," (Tr. 92:4-8), and calling minority employees "spic" and "nigger," (Tr. 459:1-10; 526:6-17).

While the above acts and remarks may not be considered sufficiently severe if made in insolation, the frequent mimicking of a Spanish or Latin accent and repeated use of derogatory words and phrases was sufficiently pervasive to create an objectively hostile work environment. *See Kouakou*, 920 F. Supp. 2d at 402 (noting that discrimination must be either severe *or* pervasive).  In addition, several of Plaintiff's co-workers generally testified that they perceived Marc Balter as treating white employees more favorably than minority employees.  (Tr. 86:16-17; 400:17-401:3; 639:7-13.)  While such allegations may not be specific enough to support a claim of disparate treatment on their own, a reasonable jury could find that those employees' perceptions corroborate Plaintiff's experience of a discriminatory workplace.  *See Rivera v.*

12

*Rochester Genesee Regional Transp. Auth.*, 743 F.3d 11, 20–22 (2d Cir. 2014).

Accordingly, Defendants' motion for judgment on the pleadings with regard to Plaintiff's hostile work environment claim is denied.

c. <u>Retaliation</u>

To prevail on a retaliation claim under the NYSHRL, a plaintiff must demonstrate that "(1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (internal quotation marks omitted). Once a plaintiff establishes prima facie retaliation, courts apply the burden-shifting analysis set forth in *McDonnell Douglas*, and the defendant must "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (internal quotation marks omitted). At that point, "the employee must show that retaliation was a substantial reason for the adverse employment action." *Id.* (internal quotation marks omitted). A plaintiff can sustain this burden by proving that "a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause; if the employer was motivated by retaliatory animus, [the NYSHRL] is violated even if there were objectively valid grounds for the adverse employment action." *Id.* at 164–65 (internal quotation marks omitted).

While the NYCHRL standard is similar in certain respects, the NYCHRL is construed more liberally and "any non-trivial discriminatory act is actionable." *Williams v. Regus Mgmt. Grp., LLC*, 836 F. Supp. 2d 159, 172 (S.D.N.Y. 2011). "[T]o prevail on a retaliation claim under the NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely

13

to deter a person from engaging in such action." *Mihalik*, 715 F.3d at 112 (internal citations omitted).

Defendants contend that Plaintiff failed to establish a causal connection between any of his complaints and the termination of his employment, thereby failing to establish a prima facie case of retaliation. (Defs.' Reply 5–6.) Defendants further contend that even if Plaintiff had established a prima facie case, Defendants articulated a legitimate, non-retaliatory reason for the adverse employment action. (Defs.' Reply 6.)

Establishing a causal link between an adverse action and retaliatory motive may be proven indirectly by showing that the protected activity was closely followed by discriminatory action. *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 364 (S.D.N.Y. 2006). Plaintiff offered sufficient evidence demonstrating temporal proximity between his protected activity and the termination of his employment. Plaintiff complained to Marc Balter regarding Rosenberg's conduct in September or October of 2011. (Tr. 91:14-22.) Plaintiff again complained to Marc Balter in December 2011 regarding the lack of locks on the trucks and truck safety, Marc Balter's use of a mimicking Spanish accent, and again about Rosenberg's conduct. (Tr. 92:17-94:18.) Approximately two weeks later, Plaintiff was fired. (Tr. 95:9-25.) Thus, for the same reasons discussed above with respect to the discriminatory termination claim, *see supra* 8–9, Plaintiff offered sufficient evidence demonstrating a causal link between the timing of his complaints and the subsequent termination of his employment.

Moreover, "anti-retaliation protection . . . extends beyond workplace-related or employment-related retaliatory acts and harm." *Baines*, 593 F.3d at 165 (internal quotation marks omitted). In other words, events that do not constitute adverse employment actions for purposes of a discrimination claim may still be considered materially adverse for purposes of a

retaliation claim.  *See Hill*, 467 F. Supp. 2d at 362–63 (citing *Burlington N. & Santa Fe Ry. Co.*

*v. White*, 548 U.S. 53, 64 (2006)).  Such actions are adverse where "harmful to the point that they

could well dissuade a reasonable worker from making or supporting a charge of discrimination."

*Baines*, 593 F.3d at 165 (internal quotation marks omitted).  Under the NYCHRL, the standard is

even lower, as an adverse action need not even be material, but only nontrivial.  *See Regus*

*Mgmt.*, 836 F. Supp. 2d at 172–73.  Here, Plaintiff presented evidence suggesting that the timing

of the filing of the police report and criminal complaint were suspect.  Plaintiff's employment

was terminated by Marc Balter on January 3, 2012.  Plaintiff claims that he then told Marc Balter

that he was going to retain counsel, (Tr. 95:9-25), and Marc Balter filed a police report shortly

thereafter, (*see* Tr. 96:24-97:6; 633:1-634:9).  Plaintiff's counsel subsequently contacted Balter

Sales, making Defendants aware that Plaintiff had in fact retained counsel.  (Tr. 844:9-845:6.)

Approximately two months later, on April 6, 2012, Marc Balter filed a criminal complaint

against Plaintiff.  (Tr. 844:3-6.)  This evidence further demonstrates a causal link between certain

protected activity and resulting adverse action.

Defendants put forth a legitimate, non-retaliatory reason for the adverse employment

actions, thereby fulfilling the second stage of the burden shifting analysis.  However, as

discussed above in connection with the employment discrimination claim, *see supra* 9–10,

Plaintiff has put forward evidence that could plausibly lead a reasonable jury to the conclusion

that retaliation was the substantial reason for Defendants' actions, *see Kwan*, 737 F.3d at 846;

*Holtz*, 258 F.3d at 79, in violation of both the NYSHRL and the NYCHRL.  Defendants' motion

for judgment on the pleadings is therefore denied as to Plaintiff's retaliation claim.

d. <u>Battery Claim</u>

An unwanted touching establishes a claim of battery. *See Aberbach v. Biomedical Tissue Servs., Ltd.*, 854 N.Y.S.2d 143, 145 (2d Dep't 2008). Defendants claim that because Rosenberg denied inappropriately touching Plaintiff, (Tr. 672:5-12), and Lori Balter claimed to have never seen Rosenberg touch anyone in an inappropriate manner, (Tr. 753:17-754:7), no reasonable jury could find for Plaintiff on this claim, (Defs.' Reply 7.)[6] However, Plaintiff presented evidence during trial, including his own testimony, that Rosenberg made sexual advances toward him on several occasions, including trying to lick his ear, touching his buttocks, and massaging his shoulders. (Tr. 88:1-89:18.) Plaintiff testified that he asked Rosenberg to stop multiple times and complained to his supervisors on various occasions regarding Rosenberg's behavior. (Tr. 89:3-91:3.) Other employees corroborated Plaintiff's testimony. Former employee Willie Rivera stated that he had seen Rosenberg massage Plaintiff's shoulders on more than one occasion. (Tr. 452:4-453:8.) Mark Mungo stated that he had both seen Rosenberg attempt to lick Plaintiff's face more than once and "try to poke [Plaintiff] in the butt." (Tr. 636:1-9.)

Viewing the evidence in the light most favorable to Plaintiff, a reasonable juror could find in his favor on the battery claim and thus Defendants are not entitled to judgment as a matter of law.

**B.    *Defendants' Motion for a New Trial or Remittitur of the Compensatory and Punitive Damages***

**1.  Applicable Law**

"When a trial court finds a damage verdict to be excessive, it may order a new trial on all issues or only on the question of damages. Alternatively, the court may grant remittitur . . . ."

---

[6] I note that the jury was instructed that they were entitled to judge the credibility of each witness, assess the importance of his or her testimony, and that reliance on the testimony of one witness alone could be sufficient for them to reach a conclusion. (*See* Tr. 1030:21-25.)

*Iannone v. Frederic R. Harris, Inc.*, 941 F. Supp. 403, 411 (S.D.N.Y. 1996) (internal citation omitted). "Remittitur is the process by which a court compels a plaintiff to choose between a reduction of an excessive verdict and a new trial." *Chisholm v. Memorial Sloan–Kettering Cancer Ctr.*, 824 F. Supp. 2d 573, 579 (S.D.N.Y. 2011) (internal quotation marks omitted). "Remittitur is appropriate to reduce verdicts only in cases in which a properly instructed jury hearing properly admitted evidence nevertheless makes an excessive award." *Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd.*, 930 F.2d 1021, 1027 (2d Cir. 1991) (internal quotation marks omitted). "A remittitur, in effect, is a statement by the court that it is shocked by the jury's award of damages." *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir. 1990).

"While it is properly within the province of the jury to calculate damages, there is an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable persons may differ, but a question of law." *Bouveng v. NYG Capital LLC*, 175 F. Supp. 3d 280, 327–28 (S.D.N.Y. 2016) (internal quotation marks omitted). "A jury has broad discretion in measuring damages, but it may not abandon analysis for sympathy for a suffering plaintiff and treat an injury as though it were a winning lottery ticket." *Id.* (internal quotation marks omitted). "Importantly, in calculating the remittitur, the court must use the least intrusive—and most faithful to the jury's verdict—method of reducing the verdict only to the maximum that would be upheld by the trial court as not excessive." *MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d 546, 559–60 (S.D.N.Y. 2012) (internal quotation marks omitted). To determine whether an award is so high as to "shock the judicial conscience," courts may "consider[ ] . . . the amounts awarded in other, comparable cases." *DiSorbo v. Hoy*, 343 F.3d 172, 183 (2d Cir. 2003) (internal quotation marks omitted). However, such earlier awards, while instructive, are not binding. *Lewis v. City of N.Y.*, 689 F. Supp. 2d 417, 430 (S.D.N.Y.

2010).  A court should determine whether the award is "within [a] reasonable range," not just "balance the number of high and low awards and reject the verdict in the instant case if the number of lower awards is greater."  *Ismail*, 899 F.2d at 187.

## 2. Application

### a. Compensatory Damages Award

Defendants assert that the jury's award of $800,000 in compensatory damages is excessive and should be remitted to an amount that they fail to specify.  Here, Plaintiff did not present specific evidence of economic harm in the form of lost wages or otherwise.  Rather, Plaintiff offered evidence that he suffered emotional distress.  "Emotional distress awards within the Second Circuit can generally be grouped into three categories of claims: garden-variety, significant and egregious.  In garden variety emotional distress claims, the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury.  Such claims typically lack extraordinary circumstances and are not supported by any medical corroboration."  *Mugavero v. Arms Acres, Inc.*, 680 F. Supp. 2d 544, 578 (S.D.N.Y. 2010) (internal citations omitted).  Garden variety emotional distress claims "generally merit $30,000 to $125,000 awards."  *Id.*  "Significant emotional distress claims differ from the garden-variety claims in that they are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses."  *Id.* (internal quotation marks omitted).  Significant emotional distress claims generally merit awards at least as high as $175,000.  *See, e.g.*, *id.* (upholding total emotional distress award of $175,000 where plaintiff offered evidence of "more than a garden variety claim").  "Finally, 'egregious' emotional

distress claims generally involve either 'outrageous or shocking' discriminatory conduct or a significant impact on the physical health of the plaintiff." *Id.* (internal quotation marks omitted). Substantially higher awards are appropriate for this type of claim. *See, e.g.*, *Ramirez v. N.Y.C. Off-Track Betting Corp.*, 112 F.3d 38, 43 (2d Cir. 1997) (affirming a $500,000 award, reduced from $1,145,625 by the district court, in employment discrimination case). "Of course, a court is not required to remit a large non-economic damage award, even where evidence of emotional damage consists solely of plaintiff's testimony." *Mendez v. Starwood Hotels & Resorts Worldwide, Inc.*, 746 F. Supp. 2d 575, 601 (S.D.N.Y. 2010). "However, when a court is convinced that the jury's award is entirely out of proportion to the plaintiff's injury, and was motivated by sympathy rather than by evidence of harm, remittitur is the appropriate remedy." *Id.*

Here, Plaintiff provided evidence of at least a "garden-variety," if not a "significant," emotional distress claim. Indeed, both Plaintiff and Dr. Steven Reich, a psychologist, proffered testimony indicating that the harassment and discrimination committed by Defendants caused Plaintiff to suffer an adjustment disorder with mixed anxiety and depressed mood. (Tr. 337:23-24.) Plaintiff testified that his symptoms ranged from trouble sleeping to lack of appetite, crying twice a month, weight loss, a reduction in sexual libido, and a significant increase in alcohol consumption. (Tr. 118:119-5; 122:8-124:4; 334:12-335:1; 336:4-8.) Plaintiff consumed so much alcohol that he was hospitalized and ultimately joined an Alcoholics Anonymous treatment program in March 2013. (Tr. 123:4-21.) Plaintiff lost thirty pounds in ten months due to anxiety. (Tr. 122:14-123:3.) Plaintiff also testified that he had problems sleeping; he slept only five hours per night and would wake up frequently. (Tr. 122:8-13.)

Looking to other cases in this Circuit, courts have approved and awarded lesser amounts

of compensatory damages in comparable cases.  *See, e.g.*, *Lore v. City of Syracuse*, 670 F.3d 127, 177 (2d Cir. 2012) ("This Court has . . . affirmed awards of $125,000 each to plaintiffs for emotional distress resulting from age discrimination where the evidence of emotional distress consisted only of testimony establishing shock, nightmares, sleeplessness, humiliation, and other subjective distress." (internal quotation marks omitted)); *Meacham v. Knolls Atomic Power Lab.*, 381 F.3d 56 (2d Cir. 2004) (upholding award of $125,000 for "subjective distress"), vacated on other grounds sub nom. *KAPL, Inc. v. Meacham*, 544 U.S. 957 (2005); *Mugavero*, 680 F. Supp. 2d at 578 (upholding $100,000 compensatory damages award for emotional distress relating to plaintiff's retaliatory discharge where plaintiff offered evidence in the form of increased anxiety and insomnia and provided corroborating medical evidence); *Zakre v. Norddeutsche Landesbank Girozentrale*, 541 F. Supp. 2d 555, 568 (S.D.N.Y. 2008) (deciding that jury award of $100,000 to compensate plaintiff for emotional distress suffered as a result of employer's discrimination and retaliation did not "shock the judicial conscience and constitute a denial of justice"); *Olsen v. Cty. of Nassau*, 615 F. Supp. 2d 35, 47 (E.D.N.Y. 2009) (finding emotional distress damages in the amount of $100,000 to be appropriate in employment discrimination and retaliation case in which plaintiff testified at trial that the conduct she was subjected to at work caused her to seek therapy on a weekly basis and ultimately begin taking antidepressants, among other things); *cf. MacMillan*, 873 F. Supp. 2d at 554 (remitting compensatory damages from $125,000 to $30,000 because plaintiff's "evidence concerning emotional distress was quite limited.  He testified that he found working in the Engineering Department 'horrible,' but otherwise did not testify about any emotional distress he suffered").

Accordingly, based on the evidence presented, I find that the jury's determination of compensatory damages was excessive.  After considering Plaintiff's case, I find that the

maximum amount that Plaintiff could recover is $75,000 from each of Balter Sales and Marc

Balter, $20,000 from Arnold Balter, and $10,000 from Barry Rosenberg, for a total of $180,000.

b.  Punitive Damages Award

In determining whether a particular punitive damages award is excessive, a court must

keep in mind that "the purpose of punitive damage awards is to punish the defendant and to deter

him and others from similar conduct in the future." *Vasbinder v. Scott*, 976 F. 2d 118, 121 (2d

Cir. 1992).  An award should be limited to the amount reasonably necessary to achieve that end.

*Id.*  At the same time, "an award should not be so high as to result in the financial ruin of the

defendant."  *Id.*

In *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), the Supreme Court

established three guideposts for courts to consider when reviewing a punitive damages award:

(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the

actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the

difference between the punitive damages awarded by the jury and the civil penalties authorized

or imposed in comparable cases.  *Id.* at 575.  After weighing these factors, a court may also

compare the instant damage award with other awards in comparable cases.  *Lee v. Edwards*, 101

F.3d 805, 812 (2d Cir. 1996).

Application of the *Gore* guideposts to this case leads me to conclude that remittitur of the

jury's punitive damages award is appropriate.  Of the *Gore* factors, the Supreme Court identified

the first—the degree of reprehensibility—as "[p]erhaps the most important indicium of the

reasonableness of a punitive damages award."  *Gore*, 517 U.S. at 575.  The Court enumerated

certain aggravating factors for courts to consider when evaluating reprehensibility:  "(1) whether

a defendant's conduct was violent or presented a threat of violence, (2) whether a defendant

acted with deceit or malice as opposed to acting with mere negligence, and (3) whether a defendant has engaged in repeated instances of misconduct." *Lee*, 101 F.3d at 809. Although there was no evidence at trial of any actual or threatened physical violence, there was evidence that Plaintiff suffered significant psychological and emotional distress as a direct result of Defendants' behavior. During the period of his employment and in particular after the termination of his employment, Plaintiff was constantly anxious, lost sleep, lost weight, felt humiliated, and was mentally and physically drained as a result of Defendants' repeated harassment. There was also ample evidence that both Marc Balter's and Rosenberg's harassment of Plaintiff was not isolated, but rather it began shortly after the start of Plaintiff's employment and continued largely unabated until his termination. In addition, the evidence strongly suggested that the firing of Plaintiff was an intentional decision in response to Plaintiff's complaints. *See supra* Parts II.A.2.a, II.A.2.c. Accordingly, there is sufficient evidence of reprehensible conduct to warrant a punitive damages award, although the degree of reprehensibility should not be overstated. *See Thomas v. iStar Fin., Inc.*, 508 F. Supp. 2d 252, 262 (S.D.N.Y. 2007).

With respect to the second *Gore* guidepost—the ratio of punitive to compensatory damages—the outsized award of compensatory damages, which led to remittitur, makes the approximately 2:1 ratio between the jury's award of punitive and compensatory damages meaningless. The ratio between the remitted award of $180,000 and $1.4 million—a ratio of over 7:1—is far enough out of proportion as to make the award of $1.4 million in punitive damages unconstitutionally excessive. While the Supreme Court has "been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award," the Court has noted that "[o]ur jurisprudence and the principles it

has now established demonstrate . . . that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 424–25 (2003).  The Court has previously held that a 4:1 ratio "might be close to the line of constitutional impropriety."  *Id.* at 425 (citing *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23–24 (1991)).  While a ratio higher than 4:1 may comport with due process in cases where a particularly egregious act resulted in nominal compensatory damages, the converse is also true, *see id.* ("When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.").  The remitted compensatory damage award in this case is not nominal, making a ratio closer to 4:1 appropriate.

Furthermore, "the Supreme Court has instructed district courts reviewing punitive damages awards to consider whether the compensatory damages for the injury suffered were based on a component which was duplicated in the punitive award."  *Osorio v. Source Enters.*, No. 05 Civ. 10029(JSR), 2007 WL 683985, at *3 (S.D.N.Y. Mar. 2, 2007) (internal quotation marks omitted).  "In many cases in which compensatory damages include an amount for emotional distress . . . there is no clear line of demarcation between punishment and compensation and a verdict for a specified amount frequently includes elements of both."  *Id.* (internal quotation marks omitted).  Here, a substantial part of the jury's compensatory damage award was necessarily based on the emotional distress suffered by Plaintiff.  Under the circumstances, I must ensure that the punitive damages award is not duplicative of the compensatory damages already awarded.  *See State Farm*, 538 U.S. at 426.  Accordingly, and because the remitted amount of compensatory damages is not nominal, I find that a lower ratio of the punitive to compensatory awards is more appropriate.  *Cf. Thomas*, 508 F. Supp. 2d at 263

(finding that "the ratio in this case is excessive because [plaintiff] was awarded a very substantial amount in compensatory damages, making a punitive award equal to the compensatory damage award more appropriate").

Regarding the third *Gore* guidepost, § 1981 and the NYCHRL permit punitive damages in employment discrimination and retaliation cases without a limitation on the maximum award. *See* 42 U.S.C. § 1981a(b)(4); N.Y.C. Admin. Code § 8-502(a); *see also Hill*, 212 F. Supp. 2d at 77 n.11.[7]  The closest analogous civil penalty relating to Plaintiff's claims is one pursuant to Title VII.  *See Kauffman v. Maxim Healthcare Servs., Inc.*, 509 F. Supp. 2d 210, 220 (E.D.N.Y. 2007).  Congress has capped the total damages for future pecuniary losses, nonpecuniary losses, and punitive damages in Title VII cases at $300,000.  *See* 42 U.S.C. § 1981a(b)(3).  While the Supreme Court has instructed courts to consider analogous statutory restrictions in determining the constitutionality of a punitive damages award, *see Gore*, 517 U.S. at 583–85, it is not appropriate to institute a de facto judicial cap on punitive damages awards in § 1981 suits by requiring consistency with the cap on awards pursuant to Title VII, *see Kauffman*, 509 F. Supp. 2d at 220–21; *see also Swinton v. Potomac Corp.*, 270 F.3d 794, 820 (9th Cir. 2001) (remarking that "[w]e do not mean here to imply that the Title VII damages cap applies in § 1981 cases; it does not," but nevertheless looking at the Title VII damages cap in analyzing the third guidepost in relation to a § 1981 case).  Accordingly, the Title VII cap also weighs in favor of reducing Plaintiff's punitive damages award, though is not dispositive.

Lastly, I note that courts in this District have found reduced punitive awards to be appropriate in comparable cases.  *See, e.g.*, *Quinby v. WestLB AG*, No. 04 Civ.7406(WHP), 2008

---

[7] The NYSHRL prohibits the imposition of punitive damages altogether in such actions.  *See* N.Y. Exec. Law § 297(9).

WL 3826695, at *5 (S.D.N.Y. Aug. 15, 2008) (remitting punitive damages from $1.3 million to $750,000 in employment discrimination case); *see also MacMillan*, 873 F. Supp. 2d at 566 (noting that courts upholding punitive damages awards of $200,000 or more generally, as here, "involve discriminatory or retaliatory termination resulting in severe financial vulnerability to plaintiff, repeated incidents of misconduct over a significant period of time, repeated failures to address complaints of discrimination, and/or deceit").

In light of the foregoing, I conclude that a remitted punitive award of $700,000 against Defendants would be maximally sufficient to serve the retributive and deterrent purposes of civil penalties without violating due process principles. If Plaintiff does not accept a remittitur of the punitive damages to $700,000, the Court will vacate the punitive damages award and conduct a new trial limited to the question of damages.

### IV.      Conclusion

Defendants' motion for judgment as a matter of law dismissing the discrimination, retaliation, and battery claims, (Doc. 150), is DENIED. Defendants' motion for a new trial, (Doc. 150), is GRANTED unless Plaintiff accepts the compensatory and punitive damages in the remitted amounts. Plaintiff has fourteen (14) days from the date of this Opinion and Order to make an election. The verdict returned by the jury otherwise stands.

Plaintiff's counsel has made a motion for an award of attorneys' fees.  (Doc. 141.)  In light of the disposition of the remittitur motion, the motion for fees is denied as moot, without prejudice to renewal if (1) Plaintiff accepts the remitted amounts, or (2) Plaintiff prevails at the retrial of his claims for damages.

SO ORDERED.

Dated: June 29, 2018
        New York, New York

Vernon S. Broderick
United States District Judge